R. & J. DICK COMPANY *v*. BLUE TRAP ROCK COMPANY.

Opinion delivered March 13, 1922.

1. PARTNERSHIP—CONSTRUCTION OF CONTRACT.—A contract between the owner of a rock-crushing plant and quarry and a third person whereby the latter leased the plant and quarry, and agreed to sell the output to the owner at a price named, the operation to be entirely in the latter's hands, and the latter to be personally liable for all expenses in connection therewith, *held* on its face to be a contract of lease and not of partnership.

2. Appeal and error—conclusiveness of verdict.—A verdict sustained by substantial evidence will not be set aside on appeal.

3. Partnership—evidence.—Evidence *held* to sustain a finding that a partnership did not exist between the lessor and the lessee of a rock quarry.

Appeal from Pulaski Circuit Court, Third Division; *Archie F. House*, Judge; affirmed.

*Emerson, Donham & Shepherd*, for appellant.

The court erred in refusing to hold that Fulton and appellee were partners, and that their agreement as well as their dealings with third parties constitued such a relation. 44 Ark. 423; 80 Ark. 29. An agreement may constitute a partnership as to third parties, when it creates no such relation between the parties themselves. 2 Ark. 354. Partnership may be proved by circumstantial evidence. 5 Ark. 61; 32 Ark. 740; 145 U. S. 611; 63 Ark. 518; 93 Ark. 524.

Appellee is estopped by its own conduct to deny the partnership as it acted in such manner as to mislead third parties. 29 Ark. 512; 80 Ark. 23; 95 Ark. 1; 32 Ark. 733.

The belt, when installed, became a fixture and a part of the realty and is not removable as personal property. 73 Ark. 227; 120 Ark. 252; 119 Fed. 438; 128 Fed. 355; C. & M. Dig., sec. 6906; 63 Ark. 369.

Humphreys, J. Appellant instituted suit against appellee in the Pulaski Circuit Court to recover $541.40, the sale price of 85 feet of machine belting which it is alleged appellant sold to George R. Fulton and appellee, and which was attached by George R. Fulton as a part of the machinery constituting a rock plant owned by appellee. Appellant sought to hold appellee liable as a partner of George R. Fulton, who ordered and received the belting from appellant and attached same to said machinery. Appellee filed an answer denying the indebtedness, and the case proceeded to a trial before the court, sitting as a jury, upon evidence responsive to the issue joined, as to whether George R. Fulton and appellee were partners in the operation of the rock plant belonging to

appellee at the time the belting was purchased and attached to the machinery. The belting was ordered during the operation of the rock plant by George R. Fulton, under the following contract (omitting formal parts):

"1. This agreement, made and entered into at Little Rock, Arkansas, this 1st day of April, 1919, by and between the Blue Trap Rock Company, a corporation incorporated under and by virtue of the laws of the State of Arkansas, hereinafter called the first party, and George R. Fulton, hereinafter called the second party, witnesseth:

"2. In consideration of the sum of one dollar ($1) in hand paid the first party by the second party, the receipt of which is hereby acknowledged, and for the further consideration  hereinafter set forth, the first party hereby grants to the second party the right and privilege of operating for a period of one year from date, the crushing plant and quarry, with all buildings, machinery, tools, wagons, appurtenances, together with sufficient land contiguous thereto, formerly the property of Chas. M. Newton Trap Rock Company, necessary for the operation of said crusher and quarry, also the railroad track, the property of the Mining Railway Company, all situated in Pulaski County, Arkansas, upon terms and conditions as follows:

"3. The second party agrees to operate the plant, quarry and crusher at his own expense and supervision and to make all needed repairs at this time for putting same in proper condition for operation, and at the expiration of this lease to return all buildings, machinery, crusher, tools, etc., to the first pary in as good condition as when taken over by him, or in better condition.

"4. As a further consideration for the execution of this lease and agreement, the second party agrees to furnish and crush rock and deliver same f. o. b. cars at said quarry at and for the price of ninety cents (90) per ton of 2,000 pounds. The basis of settlement between the parties is to be determined and governed by the net

weight of the loaded cars at the quarry, according to railroad weights as a basis of freight charges.

"5. The first party agrees to pay for said stone the sum of ninety cents per ton, as aforesaid, advances to be made weekly, and final settlement on the 10th of each month for all stone loaded during the previous month.

"6. The stone to be furnished under this agreement shall be merchantable stone, in sizes known as one, two and three. And where any stone is rejected and the first party is unable to make satisfactory adjustment with the buyer, such stone is to be turned over to the second party or held subject to his orders, and he shall be liable for the transportation, demurrage and handling thereof.

"7. This agreement does not contemplate screenings, but the first party will endeavor to dispose of same when possible to the best advantage, and upon any sales thereof to allow the second party sixty (60) per cent. of the gross amount received from such sales, provided same shall not exceed ninety (90) cents per ton.

"8. As a further consideration for the payment of rent, the second party agrees to pay the first party two-thirds (2-3) of the net profits from the operation of the quarry and the sale of rock at the aforesaid price of ninety (90) cents per ton. The other one-third (1-3) shall be retained by the second party. In addition to the necessary operating expenses, including necessary expenditures in the operation of the quarry, said second party shall be permitted to make a charge for his salary of not exceeding three hundred dollars ($300) per month.

"9. The second party agrees to operate the quarry continuously to the very best of his ability, and agrees to turn out not less than fifty thousand (50,000) tons per annum, and the first party agrees to take the output, not to exceed ninety thousand (90,000) tons per annum, but it is agreed that, in the event the first party is at any time unable to secure a sale for stone, that it shall be

bound only to store thirty days' production, after which production shall cease until further orders from the first party.

"10. It is understood that this contract is drawn for the mutual benefit of both parties and is a memorandum of an agreement for the purpose of permitting the second party to operate the said quarry and crushing plant. The operation and supervision thereof is to be entirely in the hands of the second party, and he shall be personally liable for all expenses in connection therewith, and he is not authorized and he agrees not to attempt to bind the first party for any obligations whatever, nor to represent to any one that the second party is interested with him in the operation thereof, it being clearly understood that all the first party is to do is to take the rock produced, as aforesaid, at and for the price of ninety (90) cents per ton on cars, and shall be entitled, as rent, to share in the profits as aforesaid. The second party shall not offer for sale, nor sell any rock produced from this quarry or crusher, to any person, firm or corporation other than the first party.

"11. The parties hereto mutually agree that they will keep an accurate accounting of their separate operations, covering the transactions contemplated herein, in books, in a business-like manner, and same shall be open for the inspection of the other party at all reasonable times."

The belt was not delivered until the term provided in the contract had expired. George R. Fulton continued to operate the plant for about a month after the expiration thereof, and it was during this period that the belt was delivered and attached to the machinery.

In addition to the introduction of the contract, testimony was introduced by appellant tending to show that the plant was operated by George R. Fulton and appellee as partners, and by appellee tending to show that said plant was operated by George R. Fulton as lessee of appellee, and not as a partner with it.

Appellant's first contention is that the written contract or agreement itself, between George R. Fulton and appellee, constituted a partnership between them as to third parties dealing with them. An analysis of the contract reflects that essentials tending to show a partnership relation between the parties are wanting. The plant was the individual property of appellee. No community of property existed in the plant between appellee and George R. Fulton. Appellee was exempted, under the provisions of the contract, from any loss incident to the operation of the business, and participated in the profits, if any, as rent for the use of the plant, and not as profits. The contract provided that appellee should receive a certain proportion of the profits as rent for the use of the plant by George R. Fulton. Section 10 of the contract, in very specific language, provided that the operation of the plant should be the individual business, and conducted upon the personal responsibility, of George R. Fulton. It specifically exempted appellee from any obligation whatever incident to the conduct of the business, and provided that George R. Fulton should not represent to any one that appellee was interested in the operation of said business. The contract throughout embodied the idea that it was intended as one of lease, and not of partnership. The contract in the instant case is quite similar in form and substance to the contract construed in the case of *Mehaffy* v. *Wilson*, 138 Ark. 281, as not constituting the relation of partnership.

Appellant makes the further insistence, however, that the contract, when construed in connection with the dealings of George R. Fulton and appellee with third parties, constituted a partnership relation between them. The testimony is in sharp conflict concerning their dealings with third parties. That adduced in behalf of appellee tends to show that methods were adopted to keep the business of operating the rock plant separate and distinct from other business conducted by appellee, and that when creditors of the rock plant sent bills directly

to the appellee they were immediately returned and the creditor notified that the rock plant was being operated by George R. Fulton upon his own responsibility. Separate bank accounts were kept, and all bills against the rock plant were paid by the individual checks' of George R. Fulton, drawn upon his individual account. In short, there was substantial evidence tending to show that the operation of the rock plant was the separate business of George R. Fulton, and not the partnership business of Fulton and appellee.

It is unnecessary for the court to analyze the evidence to ascertain where the weight lies, since the verdict is sustained by some substantial evidence.

No error appearing, the judgment is affirmed.